We'll turn to 22-1358, Watkins v. Wunderlich. Mr. Fairhurst. Good morning. May it please the Court, Michael Fairhurst appearing on behalf of the appellant, Bryce Watkins. In 2006, the United States Supreme Court case Georgia v. Randolph clearly established that the police cannot enter a home based on consent when the police lack a warrant or an exigency if a physically present resident expressly refuses to consent to the entry. That's exactly what happened here. Mr. Watkins unambiguously refused to consent to the police coming into his house right before the police went into his house. In fact, for purposes of this appeal, it is conceded that the police knew Mr. Watkins did not want them in his home before they went into his home. Now, the twist here, according to the district court, a twist anyway, was the 2014 Supreme Court case of Fernandez v. California. That case, a fair reading of it, is that it made clear that Randolph is limited in situations where the objector is in the house when the entry occurs based on consent. So, for example, if the objector is not in the house and then somebody else is in the house and says, you can come in, even if that person has previously objected, the person is out of the house, consent wins. So Fernandez clarified that issue, but that's not the issue presented here. In fact, the only person in Bryce Watkins' house when the police came into his house was Mr. Watkins himself, who the police knew didn't want them to be in his house. And so it's not just a Supreme Court precedent that makes clear that this is what the law is. Other courts have, in fact, appellate courts, have rejected the exact rationale endorsed by the district court here in its summary judgment order on the entry claim. For example, the Sixth Circuit in Tappan said, in rejecting the argument that at the door was key, the court said that the language used in Randolph was varied in describing the physical presence requirement, which, according to Tappan in the Sixth Circuit case, that shows that at the door is not talismanic. It shows that, instead, physical presence is talismanic. That's at page 161 of the Tappan decision. It's, I think, a very helpful explanation of why Randolph was clear on physical presence not at the door being the controlling factor. Didn't the Randolph court itself, though, say that it was limiting the scope of its decision in that case? And it specifically said something about domestic violence. It was not bearing on the capacity of the police to protect domestic violence victims. Yes, it absolutely did. And what the court was talking about there, and I think Judge Breyer's concurrence is particularly helpful on this point, there's an exigency carve-out. What the court is saying, and I think Judge Breyer is especially important here because he cast the fifth indecisive vote, so his concurrence carries a particular weight. What the court is talking about here are exigent circumstances. And I think it actually would be stipulated here that there was no exigency in play. So, for example, if you've got a potential victim of domestic violence who's in the house and the alleged perpetrator says, no, you can't come in. In a scenario like that, there may well be an exigency where consent aside, and notwithstanding Randolph, the police can still go into the house because there's a legitimate safety reason for them to go in despite lacking a warrant and despite lacking consent. That's just simply not the scenario presented here, though. The only person in Mr. Watkins' house was Mr. Watkins. No one has ever claimed there was an exigency. Ms. Watkins was actually standing outside safely talking with the police right before the police went into his home. And a case that is instructive on this, in addition to Randolph himself, is actually a case cited by Appellees yesterday in their supplemental authority. That's the United States v. Henderson, 536-537-76. That's page 781 of that Seventh Circuit case from 2008. They talk about Justice Breyer's and his consent emphasizing the majority's acknowledgment, just to quote, that police may properly enter a home despite a present occupant's objection in order to protect a victim from an ongoing or imminent crime and in certain other exigent circumstances. And then the court, the Seventh Circuit goes on to talk about how Justice Breyer highlighted the availability of exceptions for exigencies. Did that predate the more recent Supreme Court decision that limited Randolph to the Seventh Circuit opinion? Yes, it did. It did. But I think a fair reading of Fernandez is to say that it clarified Randolph, but it did not narrow Randolph. There were questions about kind of the peripheries of Randolph. How far does it go in terms of a person objecting in that carrying weight? And what Fernandez made clear is that physical presence is the controlling factor. Randolph, excuse me, Fernandez himself described physical presence as the controlling factor. And that's the scenario presented here where Mr. Watkins is in his house. The police know they don't want him in and they come in anyway, despite lacking any other potential legal justification. The district court also distinguished Randolph because the officers in Randolph entered the home to conduct the search for evidence, whereas here it was to arrest the occupant. Is that a meaningful distinction? We respectfully believe that is not a meaningful distinction. More than 40 years ago in Payton v. New York, the Supreme Court held, and this is a quote, it's a basic principle of Fourth Amendment law that searches and seizures inside a man's home without a warrant are per se unreasonable in the absence of some, one of a number of well-defined exigent circumstances. So I highlight that to say that Payton doesn't distinguish between a search standard and a seizure standard. It says that the same standard applies to both. And this court in McKernan v. King used that very quote from Payton in holding that an unlawful entry occurred in that case. And I know judges McHugh and Mattson, you know that case. Well, what do you think would have happened in Randolph if the officers came to arrest Randolph and Randolph answered the door and said, no, you can't come in? In Randolph? Yeah. I mean, according to the law, they should have said, we can't come in. Are you having a practical concern? They would have arrested him right there. They could have. I mean, so it clearly would have made a difference in Randolph itself, wouldn't it? In that case, they could have arrested him at the door. It's true. And you may be wondering, what are the police to do in a scenario like this? You've got somebody who said they won't come out. And we're not contesting the arrest, by the way. What are the police supposed to do? Well, they could have gotten an arrest warrant. They didn't, but they could have. Or they could have waited for him to come out. There are practical ways for law enforcement to deal with situations like this and to make arrests that are valid without invading the sanctity of a person's home to do it. And another point worth emphasizing when it comes to the sanctity of the home is the fact that Supreme Court jurisprudence has continued to emphasize that there are particularly strong Fourth Amendment protections when it comes to the home. For example, in Langby, California, a 2021 case, the Supreme Court noted the contours of that or any warrant requirement for hitting a home entry are jealously and carefully drawn in keeping with the centuries-old principle that the home is entitled to special protection. Kangalia V. Strom, another 2021 Supreme Court case, said, I quote, This court has repeatedly declined to expand the scope of exceptions to the warrant requirement. I mean, that's on one side. On the other side, there's lots of law that third-party consent. Two people have a property interest. Anyone with a property interest can consent to seizing the property, to entering the property. I think Fernandez could be read as saying, OK, we've got our decision here in Randolph, and we're not going to overrule it, but we're going to limit it to its specific facts. There was a big switch in the court. Two justices agreed with the results in both Randolph and Fernandez. And neither of them is on the court now. Wasn't it Kennedy and Breyer? Those are the only two who stayed the same. But it's – I'm not sure how – where you could draw a principle blind. They're just saying that was too much. But when you include the fact that they're there to arrest, that kind of undermines the authority, the applicability, I should say, of Randolph, doesn't it? I would respectfully submit no. You think in Randolph that if they had gone there to arrest him, they would have – when he says you can't come in, they would have had to go get a warrant that allowed them to enter the house? I think the quite operative question there is if they would have had to cross into the threshold of the home in order to effectuate the arrest. If the answer is no, then no, elementary, no problem. If the answer is yes, if they have to cross the threshold, then that's an unlawful home entry according to Randolph and subsequent authority. Fernandez itself at page 301 – I just want to correct before I do particular – part of Fernandez described physical presence not standing at the door as the controlling factor. One would think that if Fernandez was looking to overrule Randolph, they would have said so, but they didn't. They instead clarified that if somebody's not in the home and they say you can't come in, they lose. If they're in the home and there's no other basis to go in, no executive, no warrant, then the non-consent trumps the consent. I'm going to reserve the remainder of my time for rebuttal. Are you going to address the excessive force issue at all? Yes, but I'm going to reserve the remainder. Well, let's – I think we may have some questions about that. Okay. Let me just start with one. Could you tell us your most – your closest factually analogous case for excessive force to show clearly established law? Sure. I think a good starting point is Adam Hino-Skogin, and then also Medina D'Ukraine. Under that analysis, what courts can consider is law enforcement's own reckless or deliberate conduct that essentially creates the need to use force. Here we have an unlawful home invasion that preceding terrorizes Mr. Watkins, who's upstairs in his bedroom having a shower at the time. Then when the police are inside, unreasonably, given the reasons we talked about, they don't say why they're in the house. Before going hands-on with him, this is undisputed, nobody said, Bryce Watkins, you're under arrest. So this provocative conduct, which could have been avoided under the circumstances, causes Mr. Watkins to proceed. Coming back to the question, those are your best cases? So I think the analysis should start before the home entry, but even if it doesn't, when it comes to the takedown, that's one of the types of excessive force. We have Morris v. Noe, we have Becker v. Bateman, we have Crook v. Peters. When it comes to Nichols choking Mr. Watkins, we have Dixon v. Richter. Also, because this was a group effort, often in those scenarios, the aggregate of the force is analyzed by courts. So for a case like that, we have the 10th Circuit Booker case. When it comes to the weight, about 225 pounds of water weight— So you think Booker is factually analogous to this case? No, having been counsel of the record, I'm not trying to draw an analogy between an ambient murder and what happened here, and I don't want the court to hear otherwise. I'm simply saying that that court stands for the proposition that the defendant's conduct can be analyzed in the aggregate when there is a collective application of force, which is what happened here between Nichols taking Mr. Wunderlich down, and then a mere second or two later, then Wunderlich taking Mr. Watkins down to the ground, again forcibly applying 225 pounds to his back, while Nichols excessively tightly chain-taps his hands behind his back. And at this point, I would like to reserve the remainder of my time. I've got about a minute. Thank you. Did you have anything more you wanted to ask? No. I'll give you extra time. Whenever you want to pursue it, just do it. Mr. Dunaway? Good morning, Your Honors. My name is Kelly Dunaway. I'm actually the deputy county attorney in Douglas County, where I've been defending the cops for more than 20 years. And can I just say that, once again, it is an honor to be in this courtroom with you. It's a great courtroom, isn't it? It is the best, yes. In fact, I believe the last time I was in this courtroom, there was no horse. It was sitting in a chair before it went to the Supreme Court, and just every time I could get it. In fact, I brought my mom. Okay. Actually, my sister brought it. It surprised me. But I want to start from a very basic, almost mathematical equation, okay? Because, as you alluded to, Judge Hart, the court has a warrant requirement. But the court has long established that consent is an exception to the warrant requirement. And that the consent of a single person with a right to enter the premises, that consent is sufficient, even if there's more than two people there. Now, what the Supreme Court has done in Randolph v. Georgia is cut out a very narrow exception for the case where you have an objecting co-tenant. And someone else has equal rights to the property. But they went out of their way to narrow that and say this does not apply to an arrest. This only applies to searches. Where did they say it only applies to searches and not to an arrest? Can you point me in Randolph to that language? Yes, there's exactly that language in Randolph. They said it has nothing to do with – well, actually – It talks about domestic exigent circumstances. Right, yes, yes, yes. Okay. And I just narrowed it to that. In this case, the domestic assault alleged happened 24 hours earlier. That is true. The alleged victim was not in the home. And the officers did not see any evidence of her being assaulted when they saw her in the park. Are those – that's all true? I don't think they saw bruises or anything, if that's what you're asking. Yes. They saw a very scared woman and said she was scared to kill her. Okay. So, I mean, there wasn't a need to run into the house to save her from being attacked by her husband at that moment. Well, it depends on how you ask. Because one of the things that Judge Roberts said in the Randolph decision and that Judge Alito came back and echoed in the Randolph decision is the cops don't know when they get there. And they have to write because they have to sometimes investigate, talk to both parties to see if there is a danger. But they couldn't talk to both parties at the home because she wasn't in the home. Correct. But they had already talked to her and now they need to talk to him. In fact, that's what they asked for, for him to come down and see if she was there. But back to my earlier point, the Supreme Court very clearly said this applies to searches. It does not apply to domestic violence situations. So if the Supreme Court has not ruled on an exception for domestic violence, then we're left with the original law, which is the consent of one party is sufficient for entry to the house. Justice Souda, when he was writing the opinion in Randolph, was bending over backwards to try to placate Chief Justice Roberts' fears. Chief Justice Roberts, in his dissent, said, look, if they can't come in and get the abusing husband, then he's going to use the law. We're going to be shielding the abuser. And that's when Justice Souda said, to be clear, this is a red herring because this does not affect that situation at all. In fact, if you go further back to when they ruled on Fernandez, if you recall in that case, the police were pursuing somebody who was involved in an arm robbery. In the apartment building, they heard a woman screaming. They knocked on the door. They saw her blood and asked her to come out so they could do a protective sweep. The defendant in that case stepped up and said, you cannot come in my house and tried to make him go. They arrested him on the spot for domestic violence because they could see she was, in fact, ablaze. And they got him out of the house. They weren't in the house. They pulled him out. Now, when this thing went to trial, no one even challenged the arrest because there's been no case anyway that says you can't go in on the consent of one to do an arrest. Instead, what was challenged in Fernandez was that after the defendant was taken to jail on a domestic violence charge and they recognized that he was actually the robber they were after, they went back to that house and asked the wife, hey, can we come search? And they went in and found evidence of the robbery and he was convicted. He tried to say, wait, when you were first at that house, I told you you couldn't come in. And he was trying to take the position that that revocation of the wife's consent had a lingering effect. And they said, oh, no, it does not. It does not. But my point here is they never even addressed the arrest in Fernandez because it was a foregone conclusion that you can make that arrest going in. And it doesn't require an exigency. In fact, Justice Souter, writing on the Randolph case, said he very much understands there are cases when you won't have an exigency to justify the entrance, where you will be there just to investigate and you need to talk to the people. In fact, he said that it is silly to think, and think about that for a minute. How many Supreme Court cases can you name that use the word silly? They don't. So they're saying it is silly to think that the officer could not accompany the woman in the house to get her things, a toothbrush, change of clothes, to go stay with her mother no matter how much the co-tenured objected. And he went further and said once he is in there with the consent of the wife, if he has evidence in plain view, he's legally present. He can see it. If he has probable cause for an arrest, he can conduct that arrest if he's there. It has nothing to do with exigency. In fact, if you look at Randolph, the only time exigency is even ever mentioned is in situations where it is to say that there was no exigency. Frequently, there will be no exigency. But still, we are going to protect – it makes no sense to protect the abuser over the victim. And so they didn't even do it. Now, the only time it came up in the Fernandez case was in Justice Ginsburg's dissent. It's the only time that exigency comes up at all. And the reason she said that, as far as I can tell – this is my interpretation of where she was going – is she did not like the decision being made by the majority of the court and said we could have decided this on exigency grounds because when they saw the bleeding woman, they could have gone in anyway. So why are we even talking about her consent? And, of course, they were because this came after the fact when they came back and went in and searched on her consent. And, of course, the perpetrator was trying to say, wait a minute, I've told you enough. You can't come into my house. So as we look into this, like I said, I think there is no Supreme Court case that says you cannot go in on the consent of one party for an arrest. Certainly nobody has pointed it out to anybody. So when you have a narrow exception, like Georgia v. Randolph, that is narrowly tailored to the search, not the arrest, and which specifically doesn't touch domestic violence, then all we're left with is the original Supreme Court law. And the original Supreme Court law is consent of one party is sufficient for the entry to the property. Now, as I had mentioned, Katman – and I believe Judge Hart should have pointed out that Katman came out prior to Fernandez. The word they used in those cases – in Randolph, what the court said was that we understand that this is a very formalistic test. They talked in terms of a threshold code of conduct. So if the co-tenant is at the doorway and part of the conversation, then that's the narrow exception. And it's only for searches. Is it your position they literally have to be standing in the doorway as opposed to physically present? Exactly. A couple things on that. Number one – Well, first, yes or no? Well, I think yes. Which doorway? He's got a front door that came in through the garage. Yes. Which doorway does he have to be standing? Is it only if he's standing at the garage door when they come in? Or what if he's standing on the front doorway? And that's a very good question. And that's why after the original Randolph decision, and they said we understand this is formalistic, justifiable. So because what we're trying to protect here is when – Fernandez cites – refers to the holding of Randolph as physically present, not as standing in the doorway. And that's my point. I'm sorry. And I am getting to it. I'm not trying to avoid that point. My point is that they said formalistic. In Katman, they call it charismatic. They said, no, it doesn't have to be a doorway. It's just close enough. It's good enough. My point is that does not matter in this case because we're not talking about a search. That is arguing a narrow exception that doesn't even apply to an arrest. So anytime you want to arrest someone, even without a warrant, you can get consent from another owner. And even if the person you want to arrest is in the house yelling at you saying don't come in my house. You don't have permission. Absolutely. You can come in. Absolutely. Without a warrant. I'm sorry. Without a warrant. With the consent, yes. Without a warrant. With the consent of one party. And if you read, that was actually what Justice Souter said. Like I said, Justice Souter in the original Randolph decision was trying to placate Justice Roberts and Justice Thomas and Justice Scalia who were saying, well, wait. Why are we protecting the perpetrator and victimizing the abused? And what he said was that this does not apply to domestic violence situations. That the cops can go in to get the arrest. They can go in to do their investigation to see if there is an innocence or a need for arrest. And he said that if they want to go in just to get the woman's belongings so she can go stay with her mom, he said that they can go in. And he specifically says, no matter how loudly the co-tenant objects. That's exactly what he says. No matter how loudly he objects. The Supreme Court says that's all we have. We don't have any other Supreme Court precedent that goes the other way. Now, we do have, as pointed out by Mr. Bakerhurst, the Tappan decision. But I would say that when they say that that is not palismanic, it's the same thing as the Supreme Court saying it is formalistic. To me, the two are pretty much synonymous in this context. And so what we have is perhaps some ambiguity in Randolph. And we had Tappan going a different way in the Sixth Circuit. And then we had Cooke coming back in Fernandez and extrapolating on this and making it even more clear that, number one, no, this doesn't go forward. This doesn't last. And one should tell somebody not. And one of the things that Justice Alito wrote in the Fernandez decision was about the preemptive revocation. OK? Because if you look at the body-worn camera in this case, what you see is Ms. Watkins talking to Deputy Nichols. Her phone rings. She says, oh, it's my husband. Do you want this? She hands it to him. And he starts talking. He said, hey, I need you to come down so we can talk to you. What? Shower? Well, no, he hung up on me. Right? That is when he alleged that he said, you can't come in my house. Well, and for purposes of this appeal, you have admitted that he said you can't come in. Right, right, right. OK. My point is, though, once he said that, that is the first time that there was any discussion about entering the house. It was after he said that. Well, there were officers. What alerted him was his ring camera, because the officers were standing on his front porch. It alerted both he and his wife on their ring. And that's why he made the phone call to her, saying these people can't come in. But my point is, even if he did say that, if he said, don't come in my house, there had never been a discussion about entering the house at that point. I understand he had reason to say that if he said that. But my point is, that is a preemptive revocation, because the discussion had not happened yet. Now, when you talk about the Supreme Court saying part of the threshold codically, I get the geographical difference. I don't think it's relevant in the rest. But I get that. But they're saying it has to be part of the discussion. One tenant says you can come in. The other says, no, you can't. In this case, we didn't have that. Justice Alito pointed out the problem with this kind of preemptive revocation of a consent that hasn't even happened yet. He talked about, well, wait a minute. What if you just suspect? You're up to no good, and you suspect your wife might let those cops in. Can you just call the chief of police and say, hey, listen, if I ever give you permission to come in my house, I'm telling you right now, I'm revoking that. You can't do it preemptively. It has to be part of the conversation. And again, that's only in a certain context. So if the police were standing on his front porch with a battering ram, and he sees them, and he communicates, you may not come in my house. That's preemptive because they didn't say, hey, can we come in before they had the battering ram? I would say that that is part of the conversation. Number one, if it is an arrest, there is no Supreme Court case that says that they couldn't. That would work at all. In this other context, though, I'm sorry. I'm just seeing that I'm running out of time here. In that context, in an arrest, there is no Supreme Court case that says they could not come in with the consent of the other. Having said that, if you have consent, you don't need a battering ram. You've got somebody with a key or a garage door. Now, in this case— Are we going to get to the excessive force claim? I'd like you to address that. I'm just going to rest on Judge Moore's order. In the case you see Sykes in there, it's a Grant v. Conner issue. These guys didn't use any force. Could I just ask you, though, on that issue? At the summary judgment stage, do we need to accept Mr. Watkins' account that Sergeant Wunderlich body slammed him, choked him, and that Deputy Nichols choked him? At the summary judgment stage. I would say two things. Number one, admitted in evidence is the body on camera, and you see exactly what happened, probably more than you want to see. But it doesn't show everything. I can see that amount of time. Shall I go on? Please do. Okay. Yes. I would say that they were entitled in that arrest with somebody getting out of control, trying to get away from them, trying to escape. It meets all the Conner factors. I would say one further, if they tased him, that would have been an—they used very little force. Well, let me just come back. Did they body slam him? I see what you're saying. And obviously, I'm saying no, and you have the evidence that says no. What is it? But I wasn't there. What's the evidence? The body on camera. You think that the camera clearly contradicts what Mr. Watkins said at his deposition? I believe it does. You've got three different angles that show the primary defendant, Wunderlich, crawling above all three of them to go and hold him while they cuffed him. All right. What about his testimony that he was subjected to a chokehold? Again, I would say with three different views from the body on camera, you know that it's inaccurate, but I can't really argue with the facts. And I feel like it's a sum of the judgment. That's my point, that we have to accept those facts in considering the excessive force claim. Yes, and I very much understand the argument, and all I can say on that— The body on camera, if the video clearly shows that his deposition testimony was false, we don't have to accept his testimony. Are you saying that the video clearly establishes—uncontrovertibly, really—shows that he wasn't slammed, they didn't have a chokehold, et cetera? I would say yes, but to Judge Mathison's point, you obviously don't have everything. You do have three different views. If, for example— Okay, so it doesn't—you're saying—you're acknowledging that the video doesn't foreclose the possibility that these things happened. I would say it forecloses—I'm sorry. Go ahead. I would say it forecloses the possibility that it happened while the cameras were rolling. Okay. And if they want to come up with something that after the arrest— Let me ask you a different question about the situation. When did they tell him he was under arrest? When they walked in the door? When he first came down the stairs. That's on the—that's recorded? Well, it's on there, and I guess it depends on how detailed we're getting here because when they first came down, I'm sure there was some initial— Before they touched him. Right, before they touched him. Before they touched him, they said, you're under arrest? I didn't think that was established. Yeah, no, that might be true. That might be true. Well, then, before you start using force to restrain somebody, don't you have to give them, that person, an opportunity to surrender? Well, I would say that they said, you need to come down here, and he said no. Well, that's different. That's different from saying, you're under arrest, don't you think? Before you start using force like that, don't you have to give the person an opportunity? If somebody just comes up and starts grabbing you and restraining you and hasn't explained what the authority for it is, or even asserted the authority for it, you can expect some resistance. That doesn't give you the right to use force at that stage. Well, I wouldn't necessarily agree that it doesn't give you the right to use force because a lot of times these situations are evolving so quickly that you have to act. What they were trying to prevent was him getting in the bedroom and having a barricaded subject. Well, what do you make of the officer's testimony that Mr. Watkins didn't pose a threat to them? I believe he did not pose a threat to them, which is why there was nothing more than open hands for seized on him. There was nothing used on him except open hands because he wasn't threatening. Now, did he fight back a little bit? I suppose a lot of that was reflexive once they were trying to take him into custody. But no, there's been no allegation that he was fighting. I mean, he was resisting, but he wasn't trying to hurt anybody. Can we give you a minute? Thank you. Am I allowed to ask this? Very quickly. You're already four minutes in. The ninth and the sixth are going these guys' way. The fourth, the seventh, and the eighth are going our way. This is a split in authority. Okay, thank you. Thank you. You'll have a few minutes for this because how much time did he have already? Okay, give him five minutes. Thank you. I want to start by addressing this distinction opposing counsel is drawn between entering and search. Bonnevere, a Ninth Circuit case, decided after Fernandez, rejected the argument that there's, to use this word, the Sixth Circuit use in Tavern. They said there's no talismanic distinction between entering and search for Fourth Amendment purposes. That was already clearly established under Payton, but I think Bonnevere is instructive nonetheless because it came after Fernandez and it rejected the very argument articulated here, which is that under the Fourth Amendment, it makes a difference whether the police go into a home to effectuate an arrest or to make a search. Do you agree with counsel's last statement that he's got two or maybe it was three circuits on his side on this issue? I do not. I'm unaware of any appellate court that has upheld a home entry or a home search based on consent when a physically present resident immediately objects to the entry before it occurs. The cases cited yesterday in supplemental authority, all of those involved different circumstances. One of them was exigent circumstances. The other two involved a situation where the objector wasn't physically present when the entry occurred. So I respectfully disagree with there being a circuit split. In fact, every circuit court that has addressed this very issue, to my knowledge, has unanimously came down on our side, which is that physical presence is the controlling factor. If the objector is in the home, consent is the reason for going in. The objector's word carries the day. I want to turn to the excessive force issue and direct this court to the Tenth Circuit case Vergello, 804F3D1317. That decision shows that the district court's legal reasoning was error when it came to the basis why it dismissed the excessive force. Can you give the slide again? I'm sorry. I wasn't fast enough. Sorry. 804F3D1317. Thank you. And what that case addresses is the so-called de minimis injury requirement surrounding excessive force claims. That was one of the primary reasons why the district court determined that the case should be summarily judged and what Vergello said is, while Cortez v. McCauley, a previous Tenth Circuit case, it used broad language regarding the de minimis injury requirement. The district court didn't rely on that except for the handcuff issue, did it? The district court, as I read your order, actually said that because there were only de minimis injuries, the entire excessive force claim is going to be dismissed. But what Vergello makes clear is that requirement only applies to the handcuffing claim. Right. So that does eliminate your handcuff claim, doesn't it? I mean, his own doctor said there's no injury. We disagree. There's lingering damage to his finger. And also, the Fisher Tenth Circuit case says that psychological injuries, if they're severe enough, can be compensable. There's bruising. I acknowledge that under the law, the de minimis injury requirement does apply to the handcuffing claim. The issue here is there is significantly more force involved than simply the handcuffing. And on that point, there is a fact dispute to some extent regarding this force used. I say to some extent because even Nichols admitted to putting his hand on Mr. Watkins' neck. I'm not sure that that can be seen on the body cam because actually Nichols' body cam conveniently for him, it turned off when he was using the force. But in any event, even Nichols conceded putting his hand on Mr. Watkins' neck. Likewise, Wunderlich admitted to taking Mr. Watkins down to the ground and then putting his entire body weight, which he estimated to be about 225 pounds, on Mr. Watkins' back. You used the phrase body slammed. I'm not really sure what you're getting at there. I didn't see that in the depositions. Maybe Mr. Watkins used that term? That's our characterization of the video. Obviously, Your Honors will review it and make their own determination. But I will emphasize again that the video is chaotic. It's hard to see exactly what happened. Mr. Watkins, this isn't a quote, but essentially he did describe it as a forceful takedown. That's certainly not contradicted by the video evidence. What about the reference to choking? Again, the officers denied that they deployed a choke hold. Your client referred to a choke hold. Was there a choke hold? You know, that's a phrase of ours. I don't think that's quite right. If by choke hold you mean some sort of arm bar, we're not contending that's what occurred. The disputed issue with that is whether it was more of a strangling type action on the part of Nichols, which under the cases I discussed, if there was minimal or no resistance, would not have been justified. Apart from the handcuffs, what were the injuries from what happened on the stair? What does the record show there? So the record shows, first of all, Mr. Watkins' terror, and that is compensable. It's palpable on the body cam footage. But then the record, this is it, the appellate at 3-228. The record shows unnecessary and severe pain, bruising, and lingering damage to at least Mr. Watkins' finger. Do we have medical evidence in the record? There is not. There is Mr. Watkins' testimony. And again, I respectfully submit the evidence of injury to the extent it's pertinent to the liability question is primarily only surrounding the handcuffing claim. I see that I'm out of time. Okay, he's gone over. Okay, thank you. Thank you, counsel. Case is submitted. Counselor excused.